FILED

2015 Jun-16 PM 02:39
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **DEKALB COUNTY BOARD OF EDUCATION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.: 4:13-CV-901-VEH** |
| ) | |
| **DENITA MANIFOLD, as** ) | |
| **Parent/Guardian of A.M., a minor,** ) | |
| ) | |
| **Defendant.** ) | |

---

## <u>MEMORANDUM OPINION</u>

## I.   INTRODUCTION

This case is an appeal by plaintiff DeKalb County Board of Education ("the Board") of an administrative due process hearing decision under the Individuals with Disabilities Education Act[1] ("IDEA"). (Doc. 1 at 1). In that decision, issued on March 19, 2012, Due Process Hearing Officer Steve Morton, Jr. ("hearing officer") found in favor of plaintiff Denita Manifold ("D.M.") on several claims brought as guardian of A.M., a minor, against the Board. (*See* Doc. 11-1 at 89).

The case is now before the court on cross-motions for summary judgment by D.M. (doc. 47) and the Board (doc. 48). Each party has filed a response (doc. 49, 50)

---

[1].  20 U.S.C. § 1400, *et. seq.*

to the other's motion for summary judgment and a brief (doc. 51, 52) replying to the other's response. Having considered the motions, briefs, and administrative record, the court concludes that summary judgment is due to be granted in favor of defendant D.M.[2]

## II.   APPLICABLE LAW

### A.   The IDEA

The statutorily defined purposes of IDEA are:

(1)

    (A) to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living;

    (B) to ensure that the rights of children with disabilities and parents of such children are protected; and

    (C) to assist States, localities, educational service agencies, and Federal agencies to provide for the education of all children with disabilities;

(2) to assist States in the implementation of a statewide, comprehensive, coordinated, multidisciplinary, interagency system of early intervention services for infants and toddlers with disabilities and their families;

(3) to ensure that educators and parents have the necessary tools to improve educational results for children with disabilities by supporting

---

[2] The case was reassigned to the undersigned on October 7, 2014, due to the prior judge's taking inactive senior status. (*See*, Order, Doc. 35).

system improvement activities; coordinated research and personnel preparation; coordinated technical assistance, dissemination, and support; and technology development and media services; and

(4) to assess, and ensure the effectiveness of, efforts to educate children with disabilities.

20 U.S.C. § 1400(d) (emphasis supplied). See also *Cory D. ex rel. Diane D. v. Burke County School District*, 285 F.3d 1294, 1298 (11th Cir. 2002) ("The fundamental objective of the IDEA is to empower disabled children to reach their fullest potential by providing a free education tailored to meet their individual needs.").

A "child with a disability" is a child —

(I) with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and

(ii) who, by reason thereof, needs special education and related services.

20 U.S.C. § 1401(3)(A). Every child with a disability is guaranteed a "free appropriate public education" (FAPE), which means

special education and related services that —

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary school, or

3

secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).

"Special education" is defined as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including — (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education." 20 U.S.C. § 1401(29).

"Related services" include:

> transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(26). Each disabled student receiving special education and related services receives an "Individualized Education Program" (IEP), which is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d)" of IDEA. 20 U.S.C. § 1401(14).

4

### B.    Administrative And Judicial Review

Any party who has a complaint regarding a local education agency's provision of a FAPE to a disabled child may file a complaint with the local education agency or state education agency, and that party will be entitled to an impartial administrative due process hearing. *See* 20 U.S.C. §§ 1415(b)(6)(A) & 1415(f)(1)(A). "The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Schaffer ex rel. Schaffer v. Weast* 546 U.S. 49, 62 (2005).

Any party aggrieved by the administrative decision of a due process hearing officer may file a civil action in the nature of an appeal in a United States District Court within 90 days. 20 U.S.C. § 1415(i)(2)(A) & (B). In such an action, the court—

> (i) shall receive the records of the administrative proceedings;
>
> (ii) shall hear additional evidence at the request of a party; and
>
> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(C).

In considering the administrative record and any other evidence submitted, the district court does not apply the usual Rule 56 summary judgment standards. *Loren F. ex rel. Fisher v. Atlanta Independent School System*, 349 F.3d 1309, 1313 (11th Cir. 2003) ("[T]he usual F. R. Civ. P. 56 summary judgment principles do not apply in an

IDEA case."). Instead,

> "summary judgment [in IDEA cases] has been deemed appropriate even when facts are in dispute, and is based on a preponderance of the evidence." *Beth B. v. Van Clay*, 282 F.3d 493, 496 n. 2 (7th Cir. 2002).That is why the district court's decision "is perhaps better described as judgment on the record." *Id.*; see also *Slama v. Indep. Sch. Dist. No. 2580*, 259 F. Supp. 2d 880, 882 (D. Minn. 2003) (On motion for judgment on the record in an IDEA suit, the district court "may make a decision on the merits, even if there exist, upon the stipulated [r]ecord, disputed issues of material fact") (citation omitted).

*Fisher*, 349 F.3d at 1313 (alterations in original).

The Eleventh Circuit has summarized the appropriate standard for a district court's review of an administrative hearing officer's IDEA decision as follows:

> Whether an educational program provided an adequate education under the Act "is a mixed question of law and fact subject to de novo review." *CP v. Leon County Sch. Bd. Fla.*, 483 F.3d 1151, 1155 (11th Cir. 2007) (citing *Sch. Bd. v. K.C.*, 285 F.3d 977, 982-83 (11th Cir. 2002)). "Specific findings of fact are reviewed for clear error." Id. (citing *K.C.*, 285 F.3d at 983). "To the extent that this issue involves the interpretation of a federal statute, it is a question of law which we review de novo." *Id.* (citing *Walker County Sch. Dist. v. Bennett ex rel. Bennett*, 203 F.3d 1293, 1295 (11th Cir. 2000)).

*Draper v. Atlanta Independent School System*, 518 F.3d 1275, 1284 (11th Cir. 2008). Within that framework, the district court "has discretion to determine the level of deference it will give to the ALJ's findings." *CP*, 483 F.3d at 1156 n.4 (citing *K.C.*, 285 F.3d at 983).

If the district court finds a violation of IDEA, it also has "'broad discretion'" to fashion an appropriate remedy. *Draper*, 518 F.3d at 1284 (*quoting School Committee of*

*Burlington v. Department of Education*, 471 U.S. 359, 369 (1985)).

## III.   DEFECTS IN THE PLAINTIFF'S MOTION

Before reaching the substance of the dispute, the court notes that the Board failed to file any of the evidentiary materials cited in its motion for summary judgment along with the motion. This violates the court's order on January 7, 2015, which states the following requirement for summary judgment motions,

> The parties must file with the Clerk of Court, <u>simultaneously with their briefs</u>, <u>all evidentiary materials</u> (e.g., affidavits, exhibits, depositions, or other products of discovery) <u>relied upon in support of or opposition to summary judgment motions</u> except those materials included in the moving party's initial evidentiary submission may be referenced by any party opposing the motion.

(Doc. 43 at 7). The order also stated "Except for good cause shown, briefs and evidentiary materials that do not conform to the following requirements may be stricken." (*Id.* at 2).[3]

Even more significantly, there are substantial deficiencies in the <u>citations</u> given by the Board in its motion for summary judgment. The Board cites most often to the administrative record (*see, e.g.,* Doc. 48-1 at 1 ¶ 1 (citing to "AR 2679-2680")), which it earlier filed with the court (Doc. 24). However, the motion also has repeated citations

---

[3] The entire administrative record was filed into the record on April 15, 2014. (Doc. 24). However, the administrative record is nearly 4,000 pages and subdivided into 57 documents. (*See* Doc. 24-1 through 24-57). Therefore, the court does not consider this previous filing to be an acceptable substitute that satisfies the requirement laid out in the January 7, 2015 order.

to some other set of materials marked as "Tr."[4] It is not apparent to the court what "Tr." is or whether it has even been filed, making it impossible for the court to evaluate several of the plaintiff's claims. On account of its failure to comply with the court's January 7, 2015, order, and repeated serious defects in its citation to evidence, the Board's brief in support of its motion for summary judgment[5] is due to be **STRUCK.**[6]

## IV.    STATEMENT OF MATERIAL FACTS[7]

### A.    D.M.'s Due Process Complaints

D.M. filed a complaint for due process on August 18, 2011. She alleged that the Board denied A.M. a free, appropriate public education ("FAPE") under the IDEA. Specifically, she contended that the Board had

---

[4] (*See, e.g.,* Doc. 48-1 at 10 ¶ 62 (citing to "Tr. 1467" as well as "AR 3760-3777), and at 17 (citing to "Tr. 2060")).

[5] This applies only to the brief in support of the Board's motion for summary judgment. (Doc. 48-1). The court will still consider the Board's response to D.M.'s motion for summary judgment. (Doc. 50).

[6] However, the court has reviewed the arguments in the Board's motion and notes that they address the same issues as D.M.'s motion for summary judgment, merely arguing for the opposite conclusion. Therefore, striking the Board's motion for summary judgment does not result in any arguments in this case going unaddressed.

[7] This statement of material facts is based upon the court's review of the parties' filings and evidence. Contrary to its usual practice, the court will not address individual statements of fact provided in the parties' briefs, for several reasons. First, the plaintiff's "statements of fact" often are actually arguments or legal conclusions. (*See, e.g.,* Doc. 48-1 at 4 ¶ 23, Doc. 50 at 15 ¶ 74) . Second, the plaintiff's "additional undisputed facts," of which there are 78, repeat many (but not all) of the statements verbatim from the plaintiff's motion for summary judgment. (*See, e.g.*, Doc. 48-1 at 2 ¶ 9-13 and Doc. 50 at 6 ¶ 9-12).

(1)     failed to develop and implement an IEP that complied with state and federal law;

(2)     failed to consider A.M.'s guardian as an equal participant in the development of A.M.'s educational program;

(3)     failed to provide A.M. with assistive devices to allow her to communicate with teachers and peers;

(4)     failed to provide A.M. with an oral interpreter;

(5)     failed to implement the recommendations in the assistive technology report dated June 29, 2011;

(6)     failed to equip A.M.'s school with a phone with close captioning for A.M. to communicate with her parents and legal guardian if necessary;

(7)     failed to provide A.M. with a safe environment free from bullying and harassment;

(8)     failed to continue to provide A.M. with occupational therapy; and,

(9)     failed to understand the role of special education for children who have disabilities and legal procedures required for its implementation.

D.M. amended her due process complaint on July 26, 2012 to add as an additional violation that the Board had not provided A.M. with computer-aided real time translation ("CART") or other similar speech-to-text technology in every class, between classes, during assemblies, and/or during emergencies. She filed a second due process complaint due to the Board's failure to implement the April 10, 2012 assistive technology report. That complaint was consolidated with the underlying due process complaint that serves

as the basis of this appeal. A hearing was conducted over a period of twelve non-consecutive days from November 15, 2011 through December 18, 2012.   **B**            **.**

### A.M.'s Difficulties In School

A.M. is enrolled in the DeKalb County School System. Dennis G. Pappas, Jr., M.D. diagnosed A.M. with progressive sensorineural hearing loss and a history of chronic otitis media. She has been a patient of Dr. Pappas since she was three years old. Dr. Pappas stated that A.M. "meets the legal definition of deafness" and that "she has always demonstrated a profound sensorineural hearing loss, profound by definition." At an appointment on February 13, 2012, Dr. Pappa noted that A.M. had regressed in her ability to discriminate speech. She had a forty percent understanding score with the use of her hearing aids, meaning that she did not understand sixty percent of what was said.

A.M. relies on lip reading and facial expressions to communicate. If someone is talking but not facing A.M., she cannot understand what is being said. It is difficult for A.M. to determine what the teacher is saying and take notes at the same time. Consequently, her handwriting is difficult to read. Due to frequent problems with her hearing aids and the FM system in the classroom, she hears buzzing noises or beeping sounds. When problems existed with her hearing aids, she tried to lip read. There was no consistency in the operation of the FM system and the hearing aids: one day the FM system and the hearing aids worked, the next day they did not. Carolyn Phillips

("Phillips"), an expert on assistive technology, testified that the FM system was not working effectively in helping A.M.

A.M.'s audiologist, Kimberly Payne ("Payne"), believed that it is extremely tiring for A.M. to lip read for long periods of time. In the classroom, it was next to impossible for her to comprehend all the important information through aided hearing or lip reading. A.M. testified that she spent three to five hours per night with her grandmother and legal guardian, D.M., being retaught material that she was unable to learn at school due to her hearing deficits. She had an extra set of books at home to use. If another student asked a question in class, A.M. had no opportunity to understand the information unless that student was sitting right next to her. Prior to filing the due process complaint, CART was not being utilized in any of A.M.'s classes. A.M. believed that the CART system allowed her to access classroom information and decreased the amount of time that her guardian would have to spend re-teaching her.

A.M. also had trouble making friends at school because she could not communicate with them effectively. The other kids did not like to repeat what they said to her. She had overhead the teachers saying unpleasant things about her because they forgot to cover their mouths when they talked about her or they left the FM operating. The hearing officer noted, that during her testimony, her demeanor revealed intense focus when listening or talking, showing a need for visual cues to properly engage in

communication or to participate in a classroom setting.

Payne recommended that A.M. receive as much visual instruction as possible, including closed-captioning in real-time in order for her to fully participate in her education. Laura Parks ("Parks"), an expert with Technology Assistance for Special Consumers (TASC), completed an evaluation at the request of the Board on June 29, 2011. Parks was directed to determine which tools would assist A.M. in being more successful in her classes. Parks noted the school had amplification in some of its classrooms, but it was not always working properly. Additionally, A.M.'s hearing aids were not always working properly.

Parks recommended CART for A.M. She recommended that a specialist in CART, Alan Peacock, perform the real-time transcription. Parks believed that CART would allow A.M. to obtain an education in her least restrictive environment by letting her access the information and ask questions instantly. Parks did not believe that a transcription of the class, provided after the class was completed, would provide A.M. with access to the curriculum in the least restrictive environment. Parks stated that providing a transcription after class would not allow A.M. to be educated with her peers. Further, software programs like *Dragon Naturally Speaking* would not work in the classroom environment due to the noise level. It did not have enough accuracy and ease of use to be an acceptable accommodation for a student with hearing impairments.

### C.     Introduction And Removal Of CART

Prior to August 18, 2011, the Board had not provided any speech-to-text in the classroom even though it was recommended in the TASC report. CART was not implemented by the Board until mid-October 2011. Kimberly Maddox, A.M.'s biology teacher, testified that after the introduction of CART, A.M.'s grades increased substantially. The IEP team decided that CART would not be implemented any further in August 2012, prior to A.M.'s tenth grade year. D.M. testified that A.M. had a better comprehension of her class materials after the introduction of CART, and that after CART was removed, her grades regressed.

Phillips, an expert in assistive technology, was requested by A.M. and the Board to perform an independent evaluation of assistive technology for A.M. She served as an unbiased, neutral third party to evaluate A.M.'s need for assistive technology. Phillips performed comprehensive interviews, reviewed medical and therapeutic documentation, and made on-site observations. She interviewed and evaluated A.M. for an entire day. Phillips's opinion was that A.M. missed sixty percent of what is being said in the classroom even when utilizing her hearing aids. Phillips observed that A.M. does not hear announcements on the loudspeaker in the classroom and had no way of receiving alerts in the classroom if there had been an emergency. Phillips's expert opinion was that A.M. needed a pager for emergency announcements. She also believed that A.M. needed

speech-to-text in every class and would also possibly benefit from C-Print.

Her report concluded that speech-to-text was necessary for A.M. to achieve her educational goals as established in her IEP by her IEP team. Speech-to-text was also recommended for all announcements. A two-week trial period was needed to determine which speech-to-text method would be best for A.M. Phillips observed that the Board had not implemented any of her recommendations, except that it, at most, had provided about thirty minutes of CART per school day. Phillips reviewed the TASC report and agreed that A.M. needed a speech-to-text solution in her classes.

On March 19, 2012, the hearing officer issued a decision finding that the Board had failed to provide a free, appropriate public education to A.M. He also found that the Board failed to continue to provide Defendant with occupational therapy and speech therapy. On April 12, 2013, Plaintiff filed a notice of intent to file a civil action contesting the decision. The Board failed to implement any of the hearing officer's findings after appealing this case to federal court. A.M. filed three motions with the court to compel the Board to comply with the hearing officer's rulings. Finally, on or about August 29, 2014, the Board agreed to provide speech-to-text to A.M. by utilizing CART and InterAct AS.

**V.     ANALYSIS**

The Supreme Court dictated a two-part inquiry for courts evaluating whether a

14

school district has provided a student with a FAPE:

> First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Rowley*, 458 U.S. at 206-07 (footnotes omitted). Unfortunately for the court, the parties do not classify the alleged violations of the IDEA as procedural or substantive (i.e. inadequacies in the IEP). Therefore, the court has done its best to classify the violations in order to adhere to the analysis mandated by the Supreme Court in *Rowley.*

### A.   Procedural Requirements

"In evaluating whether a procedural defect has deprived a student of a FAPE, the Court must consider the impact of the procedural defect, and not merely the defect *per se.*" *Weiss by Weiss v. Sch. Bd. of Hillsborough Cnty.*, 141 F.3d 990, 994 (11th Cir. 1998). The hearing officer held that the Board had committed five procedural violations. First, the IEP team failed to review and revise the contents of A.M.'s IEP after she failed to make progress toward her goals. (Doc. 11-1 at 81-82). Second, the IEP team included goals that were non-measurable, which failed to meet the state law requirement of "<u>measurable</u> annual goals" that would address "the child's needs that result from the disability." (*Id*. at 83-85) (emphasis added). Third, the IEP team failed to consider A.M.'s communication needs by providing her a means to hear or read the school's daily

15

announcements. (*Id*. at 85-86). Fourth, the team failed to modify her math objective even after she stopped taking a math class. (*Id*. at 86). Fifth, the IEP team did not provide adequate documentation for why A.M. was missing several mandated classes at various times. (*Id*. at 86-88).

In this case, the claimant, A.M., no longer seeks injunctive or other prospective relief from the court. At the status conference held on January 7, 2015, counsel for both parties represented to the court that they sought summary judgment solely to determine whether A.M. would be eligible to seek an award of attorney's fees. (*See also* Doc. 34 (stating that the parties had resolved A.M.'s third, and most recent, Motion to Compel, and laying out the terms of the resolution)). Therefore, it is not necessary for the court to determine individually whether each procedural violation had the substantive effect of denying a FAPE to A.M. Rather, the court need only determine whether the procedural violations had a cumulative effect of denying a FAPE. *See Weiss*, 141 F.3d 990 at 996 (stating that claimant "must show harm to [claimant] as a result of the alleged procedural violations" (emphasis added)).

The Board's response to A.M.'s motion does not object to the hearing officer's factual findings concerning the alleged procedural violations (*see* Doc. 50 at 17-27), and, following *de novo* review of the record and the parties' briefs, the court finds no clear error in these factual findings. Rather than argue that the hearing officer erred in these

factual findings, the Board argues that the hearing officer made a legal error: he "failed to undertake the required analysis under the IDEA of determining whether this purported procedural error actually resulted in the denial of FAPE to A.M." (Doc. 50 at 19). However, to whatever extent the hearing officer failed to analyze the procedural errors' detrimental impact on A.M.'s education, his factual findings provide a sufficient basis for concluding that the Board's errors denied a FAPE to A.M..

Only one of the five procedural violations — the failure to modify A.M.'s math objective after she stopped taking a math class — appears to be inconsequential. Of the other violations, the court finds two to have been especially detrimental to A.M.'s education. First, the IEP's use of goals without any measurable component meant that there was no reliable way to assess A.M.'s progress in these areas. These non-measurable goals included completing homework and class work, studying for tests, and demonstrating appropriate body language and voice tone. (Doc. 11-1 at 84). All of these concern basic skills that are critical for a child's educational success, and since they were not written to be measurable, it was impossible to determine A.M.'s progress (or lack thereof) in those areas. Second, the IEP team failed to react adequately after A.M.'s 2009-2010 progress report indicated that she had not mastered the goal of "personal management" and was "not completing homework and classwork which [was] causing her to make low grades." (*Id*. at 83). The team simply responded by "carr[ying] over"

17

(*id*.) the goal into her IEP for the next school year verbatim, rather than revising the goal or formulating additional steps to promote A.M.'s progress in that area. This goal "was implemented to help [A.M.] use her time more effectively to completing incomplete homework, classwork, and studying for tests" — basic academic skills in which A.M., by the IEP team's own admission, lacked proficiency. (*Id*.).

The two other procedural violations — requiring A.M. to go to the office each morning to view a copy of all the school's announcements, and a failure to adequately document why and to what extent A.M. was being removed from some classes (Doc. 11-1 at 85-88) — found by the hearing officer also necessarily detrimentally affected A.M.'s academic progress, although the extent of such detrimental impact cannot be evaluated on this record. It is not clear from the record how much class time A.M. missed as a result of these violations, but it is clear that missing instruction impedes learning. Therefore, the court affirms the hearing officer's ruling that these procedural violations had the effect of denying A.M. a FAPE.

### B.    Adequacy Of The IEP

#### 1.    Speech and Occupational Therapy

The hearing officer also found that the Board committed two substantive violations of the IDEA. First, he found that the Board failed to continue to provide A.M. with occupational therapy and speech therapy. (Doc. 11-1 at 79-80). The Board raises

both factual and legal objections to this finding. (Doc. 50 at 21-22). Factually, the Board argues that A.M. "was appropriately evaluated out of speech therapy" in a process that complied with the IDEA, and that, contrary to the hearing officer's finding, A.M. did receive occupational therapy when she was due to receive it. (*Id*. at 21-22).

As for speech therapy, the record shows that it was removed from A.M.'s IEP prior to the 2010-2011 school year. (Doc. 24-52 at 30, 24-42 at 3). Ellen Bowman, a deaf-blind specialist, recommended on December 20, 2010, that the school reinstate speech therapy. (Doc. 24-52 at 31). Speech services were then added back to her IEP beginning on March 11, 2011. (Doc. 24-42 at 40). The hearing officer concluded that this seven month period (August 2010 to March 2011) without speech therapy violated the IDEA (doc. 11-1 at 80), but the court cannot find support for that conclusion in the record. Rather, according to A.M.'s IEP for the 2010-2011 school year, test results and teacher observation found that her "speech sound production [was] comparable to her peers." (Doc. 24-42 at 3). Therefore, the Board does not appear to have violated the IDEA when it removed A.M. from speech therapy for those seven months.

As for occupational therapy, the hearing officer wrote that "there is no provision within the profile page of the 8th grade IEP as to the status of OT services." (Doc. 11-1 at 80). This finding appears correct, as A.M.'s eighth grade IEP states only "[A.M.] also received OT for the 09-10 school year," which was her seventh grade. (Doc. 24-42 at

29). The Board does not point to any evidence showing that A.M. was found to no longer require occupational therapy, nor to any evidence that occupational therapy was provided during her eighth grade. (*See* Doc. 50 at 21-22). Therefore, the court concurs with the hearing officer's finding as to occupational therapy.

### 2.     Failure to Provide Appropriate Assistive Devices

The second, and most important, substantive violation found by the hearing officer is a failure to provide appropriate assistive devices to A.M. (Doc. 11-1 at 80-82). He stated that the Board had not performed adequate testing to determine if CART was appropriate and necessary for A.M, and that there was insufficient data to support the Board's assertion that other assistive technology had been sufficient for A.M.'s educational needs. (*Id*. at 81). The hearing officer also wrote that the Board had not adequately considered the testimony and reports of the two outside experts (Parks and Phillips) who had stated that A.M. required speech-to-text technology. (*Id*. at 82).

The Board objects to this finding on the basis of a supposed failure by the hearing officer to follow the correct legal analysis. The argument is somewhat difficult to follow, but as best as the court can tell, the Board alleges that the hearing officer failed to follow a two-step analysis. First, the officer was supposed to determine whether A.M. had shown that the IEPs provided to her were not reasonably calculated to provide her a FAPE. (Doc. 50 at 23). If A.M. satisfied that step, the officer would then reach the issue

20

of whether A.M. required assistive technology and services. (*Id*. at 24). The only citation provided by the Board for the supposed requirement of a two-step analysis is not on point.[8] Regardless, the Board is incorrect when it alleges that the officer failed to make specific findings that the Board's IEP failed to provide a FAPE. He found that the Board's technology of choice, an FM system, "was not reliable enough" and that there "was not sufficient evidence presented that it was used across the entire spectrum of [A.M.'s] classes." (Doc. 11-1 at 81).

The Board also contends that the hearing officer erred in his finding by utilizing a standard from the ADA for determining the need for assistive technology, rather than the IDEA standard. (Doc. 50 at 24-25). The court does not see any proof for this claim. The Board does not point to, and the court cannot find, any use by the hearing officer of language from the ADA standard, which requires public entities to provide "appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of" services or programs provided by the entity. 28 C.F.R. § 35.160(b)(1). Rather, all of the hearing officer's discussion of law in this section comes from the Supreme Court's ruling in *Rowley* that the IDEA requires schools to provide sufficient services for a "basic floor of opportunity." (*See* Doc. 11-1 at 80).

---

[8] *See* 34 C.F.R. § 300.324(a)(2)(v) (listing factors that an IEP team must consider when formulating a child's IEP).

As to the facts, just as it did in administrative proceedings before the hearing officer, the Board compares this case to *K.M. v. Tustin Unified School District*, 2011 WL 2633673 (C.D. Cal. 2011), *rev'd in part on other claims*, 725 F.3d 1088 (9th Cir. 2013). (*See* Doc. 50 at 25). In *K.M.*, the court affirmed an ALJ decision rejecting a hearing-impaired student's claim that the school district violated IDEA by refusing to provide CART. *Id* at *9-13. Although there are certain factual similarities, the court agrees with the analysis of the hearing officer as to how *K.M.* differs from the present case. (*See* Doc. 11-1 at 81-82). In *K.M.,* although there were expert opinions stating that the student needed CART, those experts had not personally observed the student in the classroom or considered all the data available to the IEP team. 2011 WL 2633673 at *4, *12. In the present case, two outside experts, Phillips[9] and Parks,[10] observed A.M. at school, and, in Phillips's case, in the classroom, before concluding that the school's assistive technology was inadequate and recommending CART or a similar technology. Another difference is that, in *K.M.*, testimony from the student's teachers and other third parties who had observed her in the classroom had revealed no trouble in comprehension, note-taking, or participation in discussions, which suggested that she was receiving an adequate education without CART. *Id*. at *12. Here, on the other hand, Phillips and Parks found

---

[9] (*See* Doc. 24-10 at 17-18).

[10] (*See* Doc. 24-23 at 16-18).

that A.M. was performing poorly in all of those tasks under her IEP. (Doc. 24-10 at 17-19, 22-23; 24-23 at 16-19).

Therefore, because a preponderance of the evidence indicates that the Board failed to provide appropriate assistive technology to A.M. by offering only FM service and denying CART, the court affirms the hearing officer's finding. The court finds it especially persuasive that both outside experts brought to observe A.M. at school were in agreement with A.M. and D.M.'s belief that an IEP without CART or another speech-to-text method was not providing her sufficient access to lectures, discussions, and classroom materials. The Board has not pointed to any other facts to contradict those experts and show that the IEPs it provided were sufficient for A.M.'s needs.

## IV.    CONCLUSION

For all of the forgoing reasons, summary judgment is due to be **GRANTED** to defendant D.M., affirming the hearing officer's findings[11] of IDEA violations by the Board. For the same reasons, the court **DENIES** the Board's motion for summary judgment. The court will enter a separate final judgment order consistent with this memorandum opinion.

---

[11] With the exception of the officer's finding of a violation by a failure to provide speech therapy, as discussed *supra*, V.B.1.

**DONE** and **ORDERED** this the 16th day of June, 2015.

**VIRGINIA EMERSON HOPKINS**
United States District Judge